**ETTINGER, Leonard L., Trustee in Bankruptcy of John S. Milne, Inc.**

v.

**CENTRAL PENN NATIONAL BANK, Appellant.**

**No. 80–1170.**

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1980.

Decided Nov. 7, 1980.

---

Robert A. Kargen (argued), LeRoy E. Perper, White & Williams, Philadelphia, Pa., for appellant.

Gary M. Schildhorn (argued), James W. Adelman, Adelman & Lavine, Philadelphia, Pa., for appellee.

I. Grant Irey, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for amicus curiae Robert Morris Associates.

Lloyd J. Schumacker (argued), Scott F. Schumacker, Schumacker & Lunkenheimer, Philadelphia, Pa., for amicus curiae Frankford–Quaker Grocery Co.

Before ALDISERT, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

■ We have granted leave pursuant to 28 U.S.C. § 1292(b) to appeal an interlocutory order of the district court. The sole question for decision is whether the holding of the district court determining that fire insurance payments are "proceeds" as that term is defined in § 9–306 of the Uniform Commerical Code, as adopted by Pennsylvania, 12A Pa.Stat.Ann. § 9–306 (recodified at 13 Pa.Cons.Stat.Ann. § 9306), should be given purely prospective application. We conclude that it should not and reverse the district court.

### I.

Ettinger, trustee in bankruptcy of John S. Milne, Inc., brought a plenary action against Central Penn National Bank under the provisions of § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b),[1] to recover payment of $39,235 by Milne to the bank. In July, 1970, prior to its bankruptcy, Milne had executed a security agreement that granted Central Penn a security interest in all existing and after acquired inventory, as well as the proceeds thereof. To perfect its security interest, the bank filed financing statements, naming Milne as debtor and itself as secured party and accurately describing the collateral, with Pennsylvania's Secretary of State and the Prothonotaries' offices in Montgomery and Bucks Counties. Continuation statements were duly filed with these offices within the statutory periods. From time to time after July, 1970, Milne borrowed various sums from the bank. It maintained a comprehensive commercial package of fire insurance as required by the security agreement. On July 11, 1977, it filed a petition under Chapter XI of the Bankruptcy Act, and an appropriate order

---

1. The Bankruptcy Act was repealed by the Act of Nov. 6, 1978, Pub.L.No. 95–598, 92 Stat. 2549. The Act continues to apply to cases, like this one, initiated before the passage of the new Bankruptcy Code. *See* title IV, § 403, Pub. L.No. 95–598, 92 Stat. 2683 (1978) (codified at 11 U.S.C. preceding § 101). All subsequent references to title 11 are to the repealed Bankruptcy Act.

of the bankruptcy court permitted it to operate the business as a debtor in possession. Subsequent to the filing of the chapter XI petition, Milne suffered a fire loss, covered by the insurance policy. Unaware of the fire loss, the bankruptcy court dismissed the Chapter XI proceedings on October 22, 1977. In November, 1977, Milne received a check from its insurer in the amount of $39,235, payable to Milne and the bank. Milne endorsed the check in favor of the bank and delivered it for credit against its obligation to the bank. Milne's other creditors learned of the payment of insurance proceeds to the bank and filed an involuntary petition in bankruptcy against Milne on November 30, 1977. An order adjudicating bankruptcy was entered and Ettinger was appointed trustee for the bankrupt's estate.

Ettinger thereafter filed a complaint pursuant to § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), against the bank in the district court seeking return of the fire insurance payment as a voidable preferential transfer. The bank defended on the ground that it had an uncontested perfected security interest in the Bankrupt's inventory and the proceeds thereof. The bank argued that it was entitled to the insurance proceeds as a result of the destruction of the underlying collateral.

The district court determined that the bank had a continuing perfected security interest in the insurance money because "proceeds" under § 9–306 of the U.C.C. includes insurance proceeds. The Pennsylvania version of § 9–306 states in relevant part:

> (1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds." All other proceeds are "non–cash proceeds."

> (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

12A Pa.Stat.Ann. § 9–306(1), (2) (recodified at 13 Pa.Cons.Stat.Ann. § 9306(a), (b)). The propriety of the court's interpretation of § 9–306 is not before us. The narrow issue certified for our decision under 28 U.S.C. § 1292(b) is the district court's further determination "that the holding on the issue of proceeds should not be retroactively applied against the parties in the instant action." *Ettinger v. Central Penn National Bank*, 2 B.R. 385, 387 (E.D.Pa.1979). The district court relied on *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), in reaching its conclusion.

We are persuaded that the district court erred in its conclusion on retroactivity. We conclude that the retroactivity issue in this case is controlled not by *Chevron Oil*, but by Pennsylvania decisions examining the retroactivity of judicial interpretations of Pennsylvania statutes. Under the Pennsylvania decisions, the district court's conclusion on retroactivity was erroneous. Moreover, even if recourse to the factors specified in *Chevron* had been proper for resolution of the retroactivity question in this case, we believe that the district court applied those factors erroneously. Under *Chevron*, as well as the Pennsylvania cases, the district court should have accorded full retroactivity to its decision.

## II.

■ We first consider, and reject, the contention of amicus curiae that a federal court does not have the power under Article III of the United States Constitution to announce a rule of law that is to be applied purely prospectively.[2] Under the common

---

**2.** Brief of amicus curiae Frankford–Quaker Grocery Company at 14. This argument relies primarily on *Stovall v. Denno*, 388 U.S. 293, 87

S.Ct. 1967, 18 L.Ed.2d 1199 (1967), in which the Court stated that

law tradition of adjudication, "there was no authority for the proposition that judicial decisions made law only for the future. Blackstone stated the rule that the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one.' " [3] Not until 1932 did non–retroactive application of court decisions attain national respectability in the landmark decision of *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). In *Sunburst*, the Court, speaking through Justice Cardozo, announced that a state court's refusal to extend full retroactivity to its decision did not offend the fourteenth amendment.

A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law nonetheless for intermediate transactions.... The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts.

*Id.* at 364–65, 53 S.Ct. at 148 (citations omitted). But it remained for *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), which extended limited retroactive effect to the rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), to usher in a new era of jurisprudential thought about prospectivity.

A galaxy of notions relating to limited retroactivity have appeared,[4] and at least three basic concepts can be gleaned from the decisions. The analysis employed by the district court in this case is generally described as "purely prospective": the new rule does not apply to the litigants before the court, but only to future litigants.[5] A second type applies the new precept to the litigants immediately before the court with an announcement that the court will apply the new rule to events that occur after the date of the decision.[6] The third type has been described as "prospective–prospective": the new precept will take effect at some time in the future, usually contingent upon failure of a legislative body to act.[7]

Although we recognize that the Supreme Court has expressed reservations about applying a decision purely prospectively, *see Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), it has

[s]ound policies of decisionmaking rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies, and in the possible effect upon the incentive of counsel to advance contentions requiring a change in the law, militate against denying Wade and Gilbert the benefit of today's decisions.

*Id.* at 301, 87 S.Ct. at 1972 (footnotes omitted) (referring to *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 81, 17 L.Ed.2d 53, *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967)).

3. *Linkletter v. Walker*, 381 U.S. 618, 622–23, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601 (1965) (quoting 1 Blackstone, Commentaries 69 (15th ed. 1809)) (footnotes omitted).

4. For a chart of landmark Supreme Court criminal law decisions setting forth various gradations of retroactivity, see "Retroactivity Chart" in R. Aldisert, The Judicial Process 936–38 (1976).

5. *See United States v. Fioravanti*, 412 F.2d 407, 420 (3d Cir.) (abolishing the *Allen* charge in this judicial circuit), *cert. denied sub nom. Pa-*

*naccione v. United States*, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

6. *See United States v. Peltier*, 422 U.S. 531, 537–38, 95 S.Ct. 2313, 2317, 45 L.Ed.2d 374 (1975); *Adams v. Illinois*, 405 U.S. 278, 284–85 (1972) (plurality opinion of Brennan, J.); *Desist v. United States*, 394 U.S. 244, 254, 89 S.Ct. 1030, 1036, 22 L.Ed.2d 248 (1969); *DeStefano v. Woods*, 392 U.S. 631, 635, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); *Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 28, 163 N.E.2d 89, 97 (1959).

7. *In re Jeruzal*, 269 Minn. 183, 195–96, 130 N.W.2d 473, 481 (1964) (adopting the Restatement of Trusts rule relating to Totten trusts); *Spanel v. Mounds View School District*, 264 Minn. 279, 281, 293–94, 118 N.W.2d 795, 796, 803 (1962) (overruling tort immunity of school districts); *see also* Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling*, 42 N.Y.U.L.Rev. 631 (1967).

done so when faced with the proper circumstances. In *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 419, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964), for example, the Court held that a party who presents his federal claims in state court pursuant to a federal court decision to abstain is foreclosed from relitigating the federal claims in federal court. Nevertheless, the Court refused to apply the new rule to the case before it because the law had been unclear. *Id.* at 422–23, 84 S.Ct. at 468; *see also Linkletter v. Walker*, 381 U.S. 618, 622 n.3, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601 (1965). This court also has applied decisions purely prospectively. *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1252 (3d Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971). We therefore reject the argument by amicus that Article III circumscribes the effect a federal court may give to its decisions.[8]

### III.

Although this case arises out of federal subject matter jurisdiction created by the Bankruptcy Act, the rights and liabilities at issue were created by Pennsylvania law. *See In re Royal Electrotype Corp.*, 485 F.2d 394, 395 (3d Cir. 1973); *Massaglia v. Commissioner*, 286 F.2d 258, 261 (10th Cir. 1961). Because the construction of relevant Pennsylvania statutes by Pennsylvania courts controls, we must also look to Pennsylvania law to determine whether the district court's construction of § 9–306 should be accorded retroactive effect. We therefore must examine Pennsylvania decisions addressing the retroactivity *vel non* of decisions construing Pennsylvania statutes.

■ The general precept in Pennsylvania is that "the construction placed upon a statute by the courts becomes a part of the act, *from the very beginning*. And when former decisions are overruled, the reconsidered pronouncement becomes the law of the statute from the date of its enactment." *Buradus v. General Cement Products Co.*,

159 Pa.Super. 501, 504, 48 A.2d 883, 885 (1946) (citations omitted), *aff'd*, 356 Pa. 349, 52 A.2d 205 (1947) (per curiam) (adopting superior court's opinion). The vitality of the *Buradus* rule was reaffirmed as recently as 1966 when the Pennsylvania Supreme Court explained: "Unless vested rights are affected, a court's interpretation of a statute is considered to have been the law from its enactment date, despite contrary intervening holdings." *Kuchinic v. McCrory*, 422 Pa. 620, 625, 222 A.2d 897, 900 (1966) (citation omitted); *see also DeMartino v. Zurich Ins. Co.*, 307 F.Supp. 571, 573 (W.D.Pa. 1969), *aff'd sub nom. Aceto v. Zurich Ins. Co.*, 440 F.2d 1320 (3d Cir. 1971); *Harry C. Erb, Inc. v. Shell Construction Co.*, 206 Pa. Super. 388, 389–90, 213 A.2d 383, 383 (1965).

■ The Pennsylvania rule is subject to the exception that full retroactivity will not be accorded to the detriment of persons who have acted in reliance on the older rule. *See Catherwood Trust*, 405 Pa. 61, 77, 173 A.2d 86, 93 (1961). As the Pennsylvania Supreme Court stated in *Kuchinic*, the rule applies "[u]nless vested rights are affected." 422 Pa. at 625, 222 A.2d at 900. The determinative inquiry, therefore, is whether controlling decisions of Pennsylvania courts have interpreted § 9–306 as excluding insurance proceeds, and, if so, whether general creditors of Milne could have justifiably relied on that prior interpretation.

Prior to July 20, 1970, when the security agreement granting a security interest to the creditor bank and requiring the bankrupt to maintain insurance on the collateral was executed, no Pennsylvania court had held that insurance proceeds were not proceeds under U.C.C. § 9–306. Appellee relies on *Hoffman v. Snack*, 37 Pa.D. & C.2d 145 (Allegheny Cty.1964), as support for its argument that the Pennsylvania courts would not have deemed fire insurance proceeds as within § 9–306 before the decision below. We are not persuaded, however, that *Hoffman* is strong enough authority for this proposition to justify reliance on the narrow

---

**8.** Other decisions are collected in Currier, *Time and Change in Judge-Made Law: Prospective*

*Overruling*, 51 Va.L.Rev. 201 (1965).

interpretation of § 9–306. As the district court noted, *Hoffman* did not address this issue, 2 B.R. at 389. Indeed, *Hoffman* examined the right of a secured party to intervene in an action by the debtor alleging negligent destruction of the collateral; it does not involve the right of a security holder to the proceeds of the collateral. *See* 37 Pa.D. & C.2d at 147.

Before 1970, appellate decisions in Rhode Island [9] and Maine [10] had denied "proceeds" status to insurance funds, but serious legal scholarship had been published advocating the contrary result.[11] Prior to the filing of continuation statements, the North Carolina Court of Appeals [12] and a series of decisions by federal bankruptcy referees in various jurisdictions had held insurance recoveries to be proceeds.[13] In 1976, the second circuit handed down the first federal court of appeals decision. *PPG Industries, Inc. v. Hartford Fire Insurance Co.*, 531 F.2d 58, 61 (2d Cir. 1976).[14]

Thus, by July 20, 1977, when Central Penn extended $41,762 to the bankrupt, it cannot be said that the case law was sufficiently clear that unsecured creditors in Pennsylvania could expect a secured creditor to be foreclosed from insurance proceeds under § 9–306. Indeed, in 1972 the Commissioners on Uniform State Laws had amended the Uniform Commercial Code to state explicitly that insurance payments are proceeds. The official reasons for this amendment imply an intent to make explicit what had been intended from the beginning.[15] We conclude that the general Pennsylvania rule of statutory construction ap-

---

**9.** *Universal C.I.T. Credit Corp. v. Prudential Investment Corp.*, 101 R.I. 287, 292–94, 222 A.2d 571, 575 (1966).

**10.** *Quigley v. Caron*, 247 A.2d 94, 96 (Me.1968). *See also In re Hix*, 9 U.C.C.Rep.Serv. 925, 927–28 (S.D.Ohio 1969) (bankruptcy referee); *In re Levine*, 6 U.C.C.Rep.Serv. 238, 241 (D.Conn. 1969) (bankruptcy referee).

**11.** *See* Henson, *Insurance Proceeds as "Proceeds" Under Article 9*, 18 Cath.U.L.Rev. 453, 457–59 (1969); *see also* Gillombardo, *The Treatment of Uniform Commercial Code Proceeds in Bankruptcy: A Proposed Redraft of Section 9–306*, 38 U.Cin.L.Rev. 1, 2–4 (1969); 65 Mich.L.Rev. 1514, 1521 (1967).

**12.** *Northside Properties, Inc. v. Ko–Ko Mart, Inc.*, 28 N.C.App. 532, 539, 222 S.E.2d 267, 271–72, *review denied*, 289 N.C. 615, 223 S.E.2d 392 (1976).

**13.** *Fireman's Fund American Ins. Co. v. Ken-Lori Knits, Inc.*, 399 F.Supp. 286, 290–91 (E.D. N.Y.1975); *PPG Industries, Inc. v. Hartford Fire Insurance Co.*, 384 F.Supp. 91, 96–97 (S.D. N.Y.1974), *aff'd*, 531 F.2d 58 (2d Cir. 1976); *In re Hunter*, 9 U.C.C.Rep.Serv. 928, 929 (S.D. Ohio 1971) (bankruptcy referee); *but see White v. Household Finance Corp.*, 158 Ind.App. 394, 406 & n.9, 302 N.E.2d 828, 836 & n.9 (1973); *In re Waltman*, 18 U.C.C.Rep.Serv. 576, 579 (S.D. Ala.1975) (bankruptcy referee); *Distributor's Warehouse, Inc. v. Madison Auto Parts & Service Corp.*, 8 U.C.C.Rep.Serv. 569, 573–74 (Wisc.Cir.Ct., Dade Cty.1970).

**14.** *See also* Note, *Security Interests in Insurance Payments on Destroyed Collateral as "Proceeds" and their Priority under the Federal Tax Lien Act of 1966*, 45 Fordham L.Rev. 596, 599, 616–24 (1976). In the same year as the Second Circuit's decision, two bankruptcy judges held to the contrary. *In re Whitacre*, 21 U.C.C.Rep.Serv. 1169, 1175 (S.D.Ohio 1976) (bankruptcy referee); *In re Parks*, 19 U.C.C. Rep.Serv. 334, 335 (E.D.Tenn.1976) (bankruptcy referee).

**15.** The official text of § 9–306(1) was amended in 1972 to state:

"Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are "cash proceeds." All other proceeds are "non–cash proceeds."

U.C.C. § 9–306(1). The comment accompanying the amendment says that it "is intended to overrule various cases to the effect that proceeds of insurance on collateral are not proceeds of the collateral." U.C.C. § 9–306 (Official Reasons for 1972 Change). The 1972 Official Comment explains subsection (1) by noting: "It makes clear that insurance proceeds from casualty loss of collateral are proceeds within the meaning of this section." U.C.C. § 9–306, 1972 Official Comment No. 1 (1980 version). Pennsylvania has not yet adopted this amendment, but because the drafters characterized it as "mak[ing] clear" their initial intent, it is a persuasive indication of the meaning of 12A Pa.Stat.Ann. § 9–306 (recodified at 13 Pa.Cons.Stat.Ann. § 9306). *See PPG Industries*, 531 F.2d at 61.

plies as set forth in *Buradus*: "the construction placed upon a statute by the courts becomes a part of the act, *from the very beginning.*" 159 Pa.Super. at 504, 48 A.2d at 885. We are not persuaded that there could have been vested rights based on a contrary interpretation of § 9–306, because there were neither Pennsylvania decisions holding to the contrary nor legal scholarship pointing in that direction. Therefore, we cannot call into play the exception to the Pennsylvania rule under which full retroactivity is denied to those decisions that operate to the detriment of persons who have acted in reliance on an older rule. There simply was no clear "older rule" in Pennsylvania.

### IV.

We are persuaded that the federal retroactivity test indicates the same result. In *Chevron Oil Co. v. Huson*, the Court stated:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed .... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted). In criminal cases, the Supreme Court generally considers three factors in resolving retroactivity issues: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). This analysis is derived from *Linkletter v. Walker*, 381 U.S. at 628–29, 85 S.Ct. at 1731, 1737, and decisions following it. *See Johnson v. New Jersey*, 384 U.S. 719, 727–29, 86 S.Ct. 1772, 1777, 16 L.Ed.2d 882 (1966); *Tehan v. Shott*, 382 U.S. 406, 418–19, 86 S.Ct. 459, 466, 15 L.Ed.2d 453 (1966).

Viewing the circumstances of this case against the backdrop of *Chevron*, we are persuaded that the district court did not overrule clear past precedent on which litigants may have relied, nor, in view of the emerging professional literature and persuasive precedent, decide an issue that was not clearly foreshadowed. The court's decision was in harmony with the drafters' stated purpose, albeit subsequently announced in their 1972 amendment to § 9–306. Finally, in the absence of evidence of reliance on a contrary interpretation, coupled with "substantially inequitable results" attributable to that reliance, we ascertain no "injustice or hardship" in giving full retroactivity to the holding. Under the Supreme Court's test for retroactivity, we reach the same conclusion for the same reasons as when the Pennsylvania test is employed: there simply was no proof of the other creditors' reliance on a contrary interpretation of § 9–306.

### V.

Accordingly, the judgment of the district court will be reversed.